**Commonwealth of Massachusetts**
**County of Hampshire**
**The Superior Court**

CIVIL DOCKET# **HSCV2004-00193**

05 CV 30036-MAP

Karen Unaka,
Plaintiff(s)
vs.
South Middlesex Opportunity Council, Bruce S. Hulme, Rena Manigo-Murray, Amy Toller, Victoria Peterson, Renee Albert,
Defendant(s)

U.S. DISTRICT COURT FILED

## ORDER OF TRANSFER

Pursuant to Massachusetts General Laws Chapter 231, Section 102C, as amended, and in accordance with Superior Court Rule 29, the above referenced case is
Case REMOVED this date to US District Court of Massachusetts. Certified copy of all pleadings and docket entries mailed to U.S. District Court in Springfield.

Dated at Northampton, Massachusetts this 14th day of March, 2005.

Harry Jekanowski, Jr.

Harry Jekanowski, Jr.,
Clerk of the Courts

FILED
U.S. DISTRICT COURT

**COMMONWEALTH OF MASSACHUSETTS**

**Hampshire, ss**

**Superior Court**
**Civil Action No. 04-193**

05cv30036-MAP

**CERTIFICATION**

I, Harry Jekanowski, Jr., Clerk of the Superior Court for the County of Hampshire do hereby certify that the attached is a true copy of all pleadings and docket entries.



Karen Unaka

vs.

South Middlesex Opportunity Council,
Bruce S. Hulme, Rena Manig0-Murray,
Amy Toller, Victoria Peterson,
Renee Albert



Witness my hand and the seal of the Superior Court Department of the Trial Court this 14th day of March 2005

Harry Jekanowski, Jr.
Clerk/Magistrate

Commonwealth of Massachusetts
HAMPSHIRE SUPERIOR COURT
Case Summary
Civil Docket

## HSCV2004-00193
## Unaka v South Middlesex Opportunity Council et al

| | | | |
|---|---|---|---|
| **File Date** | 08/13/2004 | **Status** | Disposed: transfered to other court (dtrans) |
| **Status Date** | 03/14/2005 | **Session** | A - Civil A- CtRm 2-3rd fl |
| **Origin** | 1 | **Case Type** | E17 - Civil Rights Act (12.011H-1) |
| **Lead Case** | | **Track** | A |

| | | | | | |
|---|---|---|---|---|---|
| **Service** | 01/10/2005 | **Answer** | 01/10/2005 | **Rule12/19/20** | 01/10/2005 |
| **Rule 15** | 11/06/2005 | **Discovery** | 10/02/2006 | **Rule 56** | 12/01/2006 |
| **Final PTC** | 03/31/2007 | **Disposition** | 08/13/2007 | **Jury Trial** | Yes |

### PARTIES

**Plaintiff**
Karen Unaka
P.O. Box 754
Hadley, MA 01035
Phone: 413-584-2865
Active 08/13/2004 Notify

**Defendant**
South Middlesex Opportunity Council
Answered: 02/01/2005
Answered 02/01/2005

**Private Counsel 637383**
Marisa L Pizzi
Bowditch & Dewey
161 Worcester Road
Framingham, MA 01701
Phone: 508-416-2412
Fax: 508-872-1492
Active 02/01/2005 Notify

**Private Counsel 548728**
John H. Perten
161 Worcester Road
Post Office Box 9320
Framingham, MA 01701
Phone: 508-879-5700
Active 02/01/2005 Notify

**Defendant**
Bruce S. Hulme
Answered: 02/01/2005
Answered 02/01/2005

**Private Counsel 637383**
Marisa L Pizzi
Bowditch & Dewey
161 Worcester Road
Framingham, MA 01701
Phone: 508-416-2412
Fax: 508-872-1492
Active 02/01/2005 Notify

Commonwealth of Massachusetts
HAMPSHIRE SUPERIOR COURT
Case Summary
Civil Docket

## HSCV2004-00193
## Unaka v South Middlesex Opportunity Council et al

**Private Counsel 548728**
John H. Perten
161 Worcester Road
Post Office Box 9320
Framingham, MA 01701
Phone: 508-879-5700
Active 02/01/2005 Notify

**Defendant**
Rena Manigo-Murray
Service pending 08/13/2004

**Defendant**
Amy Toller
Served: 02/07/2005
Served (answr pending) 02/11/2005

**Defendant**
Victoria Peterson
Inactive 01/07/2005

**Defendant**
Renee Albert
Inactive 01/07/2005

**ENTRIES**

| Date | Paper | Text |
|---|---|---|
| 08/13/2004 | 1.0 | Affidavit of indigency and Request for Waiver, substitution or state payment of filing fee, cost of summons and service, waived (IMPOUNDED) |
| 08/13/2004 | 2.0 | Complaint with jury claim & civil action cover sheet filed |
| 08/13/2004 | | Origin 1, Type E17, Track A. |
| 08/16/2004 | | Tracking: origin/track set and mailed to plaintiff. |
| 11/17/2004 | 3.0 | Plaintiff Karen Unaka's MOTION to extend time for service. |

Commonwealth of Massachusetts
HAMPSHIRE SUPERIOR COURT
Case Summary
Civil Docket

## HSCV2004-00193
## Unaka v South Middlesex Opportunity Council et al

| Date | Paper | Text |
|---|---|---|
| 11/19/2004 | | MOTION (P#3) Excusable neglect and good cause having been shown, motion is ALLOWED. Time for service extended to 1/10/05. (Mary-Lou Rup) Notices mailed November 19, 2004 |
| 01/07/2005 | 4.0 | Amended Complaint of Karen Unaka. |
| 01/07/2005 | 5.0 | Plaintiff Karen Unaka's MOTION to extend time for service of process. |
| 01/11/2005 | | MOTION (P#5) ALLOWED and time for service is hereby extended to 2/8/05. No further extensions. (Mary-Lou Rup) Notices mailed January 12, 2005 |
| 02/01/2005 | 6.0 | ANSWER: South Middlesex Opportunity Council(Defendant) and Bruce S. Hulme (Defendant) |
| 02/11/2005 | 7.0 | SERVICE RETURNED: Amy Toller(Defendant) |
| 03/02/2005 | 8.0 | ANSWER (amended complaint): South Middlesex Opportunity Council., Inc., Bruce S. Hulme and Amy Toller, defendants |
| 03/14/2005 | 9.0 | Certificate of service of plaintiff. |
| 03/14/2005 | 10.0 | Notice for Removal to the United States District Court filed by South Middlesex Opportunity Council and Bruce S. Hulme. |
| 03/14/2005 | | Case REMOVED this date to US District Court of Massachusetts. Certified copy of all pleadings and docket entries mailed to U.S. District Court in Springfield. |

**EVENTS**

| Date | Session | Event | Result |
|---|---|---|---|
| 11/17/2004 | Civil A- CtRm 2-3rd fl | Status: administrative (3) Ex parte | Event held as scheduled |
| 01/07/2005 | Civil A- CtRm 2-3rd fl | Status: administrative (5) Motion | Event held as scheduled |

**CIVIL ACTION COVER SHEET**

DOCKET NO(S) 04 193

Trial Court of Massachusetts
Superior Court Department
County:

PLAINTIFF(S): Karen Unaka

DEFENDANT(S): South Middlesex Opportunity Council

ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE

ATTORNEY (if known)

Board of Bar Overseers number:

**Origin code and track designation**

Place an x in one box only:

- [X] 1. F01 Original Complaint
- [ ] 2. F02 Removal to Sup.Ct. C.231,s.104 (Before trial) (F)
- [ ] 3. F03 Retransfer to Sup.Ct. C.231,s.102C (X)
- [ ] 4. F04 District Court Appeal c.231, s. 97 &104 (After trial) (X)
- [ ] 5. F05 Reactivated after rescript; relief from judgment/Order (Mass.R.Civ.P. 60) (X)
- [ ] 6. E10 Summary Process Appeal (X)

**TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| E17 | civil | (F) | (✓) Yes ( ) No |

**The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.**

**TORT CLAIMS**

(Attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses . . . . . $ . . . . .
2. Total Doctor expenses . . . . . $ . . . . .
3. Total chiropractic expenses . . . . . $ . . . . .
4. Total physical therapy expenses . . . . . $ . . . . .
5. Total other expenses (describe) . . . . . $ . . . . .

**Subtotal** $ . . . . .

B. Documented lost wages and compensation to date . . . . . $ . . . . .
C. Documented property damages to date . . . . . $ . . . . .
D. Reasonably anticipated future medical and hospital expenses . . . . . $ . . . . .
E. Reasonably anticipated lost wages . . . . . $ . . . . .
F. Other documented items of damages (describe) $ . . . . .

G. Brief description of plaintiff's injury, including nature and extent of injury (describe)

emotional distress, decline in health due to displacement by actions of South Middlesex Opportunity Councils Officers, sudden loss of housing, postponement of medical care & treatment, embarrassment, harassment

$ . . . . .

**TOTAL $** . . . . .

HAMPSHIRE SUPERIOR CRT
HARRY JEKANOWSKI JR
CLERK
2004 AUG 13 P 4: 04

**CONTRACT CLAIMS**

(Attach additional sheets as necessary)

Provide a detailed description of claim(s):

**TOTAL $.** . . . . .

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

**"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."**

Signature of Attorney of Record K Unaka DATE: 08/13/04

10

I hereby certify on 3/9/05 that the foregoing document is true and correct copy of the
☐ electronic docket in the captioned case
☐ electronically filed original filed on
☒ original filed in my office on
Sarah A. Thornton
Clerk, U.S. District Court
District of Massachusetts
By: [signature]
Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.

| | |
|---|---|
| KAREN UNAKA, Plaintiff, | NOTICE OF REMOVAL |
| vs. | 05-30036-MAP |
| SOUTH MIDDLESEX OPPORTUNITY COUNCIL, Bruce S. Hulme, President & Relevant Parties, Defendants. | |

FILING FEE PAID:
RECEIPT # 305841
AMOUNT $ 150.00
BY DPTY CLK MGH
DATE 2/3/05

Pursuant to 28 U.S.C. §§1441(a) and (b) and 1446, South Middlesex Opportunity Council, Inc. ("SMOC") and Bruce S. Hulme ("Hulme") hereby file their Notice of Removal of the above-captioned case to this Court from the Massachusetts Superior Court for Hampshire County. As grounds for the removal, SMOC states as follows:

1. This action was commenced in the Massachusetts Superior Court, Hampshire Division, as Civil Action No. 04-193. Copies of plaintiff's Summons and Complaint, setting forth the claims for relief upon which this action is based, were first served on Hulme, president of SMOC, on January 10, 2005[1].

2. Plaintiff has brought this action for alleged violations of civil rights and denial of her due process rights, *inter alia,* by persons acting under color of state law, in violation of 42 U.S.C., § 1983 and the United States Constitution. A copy of the summons and complaint served upon Hulme is annexed hereto as Exhibit A.

HAMPSHIRE SUPERIOR COURT
HARRY JEKANOWSKI JR
CLERK
2005 FEB -9 P 1:5

[1] It is unclear whether Mr. Hulme is a party to this lawsuit and whether service upon him is deemed service on the defendant corporation. Accordingly, in an overabundance of caution, while reserving its right to contest proper service, Mr. Hulme and SMOC have both filed an answer in the Superior Court and file this Notice of Removal.

3. This Court has original jurisdiction over this action pursuant to the provisions of 28 U.S.C., §1331. Plaintiff has alleged violation of a federal statute and of the United States Constitution.

4. Because this Court has original jurisdiction over this matter, SMOC and Hulme are entitled to remove this action pursuant to 28 U.S.C., §1441(a) and (b).

WHEREFORE, defendants South Middlesex Opportunity Council, Inc. and Bruce S. Hulme give notice that this action is removed from the Massachusetts Superior Court for Hampshire County to this Court.

SOUTH MIDDLESEX OPPORTUNITY COUNCIL, INC. and BRUCE S. HULME

By their attorneys,

John H. Perten (BBO # 548728)
Marisa L. Pizzi (BBO # 637383)
Bowditch & Dewey
161 Worcester Road
Framingham, MA 01701
(508) 879-5700

Date: January , 2005

CERTIFICATE OF SERVICE

I, John H. Perten, Esq. hereby certify and say that on this 31 th day of January, 2005, I served a copy of the foregoing by mailing a copy thereof, postage paid, to:

Karen Unaka
P.O. Box 754
Hadley, MA 01035

John H. Perten, Esq.

{J:\CLIENTS\lit\192720\0104\F0294251.DOC;1}

JAN-28-2005 10:32 EXHIBIT A P.02/07

COMMONWEALTH OF MASSACHUSETTS
HAMPSHIRE, SS.

Superior Court Department
Trial Court of the Commonwealth
Civil Action

No. 04 193

Karen Uliaka, Plaintiff (s)

v.

Bruce S Hulme, President South Middlesex Opportunity Council [illegible] Murray, Program Coord [illegible] Anne [illegible], Regional Director [illegible], Defendant (s)

SUMMONS

A TRUE COPY ATTEST
DEPUTY SHERIFF

To the above-named Defendant : Bruce S. Hulme,

You are hereby summoned and required to serve upon Karen Uliaka, plaintiff attorney, whose address is P.O. Box 754 Hadley, MA 01035, an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Northampton, either before service upon plaintiff attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff claim or you will thereafter be barred from making such claim in any other action.

Witness, Suzanne V. DelVecchio, Esquire at Northampton, the day of , in the year of our Lord two thousand

Harry Jekanowski, Jr.
CLERK-MAGISTRATE

NOTICE TO DEFENDANT — You need not appear personally in court to answer the complaint but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

NOTES:
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.
3. Circle type of action involved. Tort. – Motor Vehicle Tort – Contract – Equitable relief.

JAN-28-2005 10:31 P.01/07

**CIVIL ACTION COVER SHEET**

DOCKET NO.(S) 04 193

Trial Court of Massachusetts
Superior Court Department
County:

| PLAINTIFF(S) | DEFENDANT(S) |
|---|---|
| Karen Unaka | South Middlesex Opportunity Council |
| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE | ATTORNEY (if known) |
| Board of Bar Overseers number: | |

**Origin code and track designation**

Place an x in one box only:

- [X] 1. F01 Original Complaint
- [ ] 2. F02 Removal to Sup.Ct. C.231,s.104 (Before trial) (F)
- [ ] 3. F03 Retransfer to Sup.Ct. C.231,s.102C (X)
- [ ] 4. F04 District Court Appeal c.231, s. 97 &104 (After trial) (X)
- [ ] 5. F05 Reactivated after rescript; relief from judgment/Order (Mass.R.Civ.P. 60) (X)
- [ ] 6. E10 Summary Process Appeal (X)

**TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| E17 | civil | (F) | (✓) Yes ( ) No |

**The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.**

**TORT CLAIMS**

(Attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses .......... $ ..........
2. Total Doctor expenses .......... $ ..........
3. Total chiropractic expenses .......... $ ..........
4. Total physical therapy expenses .......... $ ..........
5. Total other expenses (describe) .......... $ ..........

Subtotal $ ..........

B. Documented lost wages and compensation to date .......... $ ..........
C. Documented property damages to date .......... $ ..........
D. Reasonably anticipated future medical and hospital expenses .......... $ ..........
E. Reasonably anticipated lost wages .......... $ ..........
F. Other documented items of damages (describe)

$ ..........

G. Brief description of plaintiff's injury, including nature and extent of injury (describe)

emotional distress, decline in health due to displacement by actions of South Middlesex Opportunity Councils Officers, sudden loss of housing, postponement of medical care & treatment, embarrassment, harassment

$ ..........

TOTAL $ ..........

HAMPSHIRE SUPERIOR CRT
HARRY JEKANOWSKI, JR.
CLERK
2004 AUG 13 P 4:14

**CONTRACT CLAIMS**

(Attach additional sheets as necessary)

Provide a detailed description of claim(s):

TOTAL $. ..........

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

**"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."**

Signature of Attorney of Record K Unaka DATE: 08/13/04

AOTC-6 mtc005-11/99
A.O.S.C. 1-2000

COMMONWEALTH OF MASSACHUSETTS

| | | |
|---|---|---|
| HAMPSHIRE, ss. | ) | SUPERIOR COURT<br>NORTHAMPTON DIVISION<br>DOCKET NO. 04 193 |
| KAREN UNAKA<br>Plaintiff | ) | |
| vs. | ) | |
| SOUTH MIDDLESEX OPPORTUNITY COUNCIL<br>Bruce S. Hulme, President & Relevant Parties<br>Defendants | ) | |

1 The Plaintiff, KAREN UNAKA is an individual, and former resident of Wright House Easthampton, MA, Hampshire County

2 The Defendant, SOUTH MIDDLESEX OPPORTUNITY COUNCIL, Administrative Offices located at 300 Howard Street Framingham, MA, owner and operator of Wright Home for Women, Easthampton MA, Hampshire County

3 Defendant, RENA MANIGO-MURRAY, Program Coordinator, Wright House for Women

4 Defendant, AMY TOLLER, Director, Wright House for Women

5 Defendant, VICTORIA PETERSON, House Monitor/Resident, Wright House for Women

6 Defendant, RENEE ALBERT, Resident, Wright House for Women

All Other Relevant Authorized South Middlesex Opportunity Council Officers Involved in Actions in Violation of the Rights of Plaintiff, Ms. Karen Unaka in the Matter of August 9-14, 2001.

## COMPLAINT AND JURY DEMAND

### Overview

Beginning on or about July 27, 2004 until August 14, 2001 I, Karen Unaka, was a resident at the Wright Home for Women in Easthampton, MA, a transitional housing program owned and operated by South Middlesex Opportunity Council (SMOC). My stay there was necessitated by the loss of my long-term rental housing after sale by the owner and an acute medical condition, which needed *immediate* action. Upon my arrival, I made it clear to Program Coordinator, Ms. Manigo-Murray that I did not abuse alcohol or drugs, and asked that this be noted in my file—rather my circumstances necessitated a transitional living arrangement so that I could become re-employed and re-housed, while pursuing a plan of action for my health. All that I asked for was a clean, quiet, stable environment in which to do so. I was accepted into the residence with the understanding that my stay would be a maximum of nine months with a 100% rental subsidy. I was forcibly removed without due process of law, based on the false allegations of another resident who was a known alcoholic and substance abuser, allowed to act as "house monitor" by the Program Coordinator, Rena Manigo-Murray. Allegations were subsequently trumpeted by the Program Coordinator, without benefit of any

grievance procedure whatsoever, and with the support of a "witness" who was also a known substance abuser with a heroin addiction, under suspicion of continued alcohol use while in residence. Nor were either of these parties—the accuser and the "witness"--required to be present at the time that I was informed of the allegation by the Program Coordinator. I had an acute medical condition for which I needed an immediate operation and thought this a stable place to live and enough time allotted in which to address the problem. Further, I thought if I simply focused, and a set my own "program" goals for getting back to health, I would be left in peace by other residents, despite their addictions. Instead I found myself swept up in a maelstrom of false accusations by substance abusers, and was subsequently returned to the very situation I came to Wright House in search of a resolution for. With my ouster, I had to postpone my operation for many months, while addressing the immediacy of my housing dilemma. My health suffered as a result.

<u>Statement of Facts</u>

1) On morning of Thursday, August 9, 2001, Program Coordinator at the Wright Home for Women, Rena Manigo-Murray called me into her office and accused me of "striking" her "house monitor," Victoria Peterson. This is my first hearing of this. I attempt to discuss the matter, but she has already made up her mind. I am told to find another place by five o'clock that day. Her response, at my request that the accuser be present and to my denial of this accusation, is to sit stony-faced and repeat, "Yeah, we've had some problems before."

2) The problem has been my questioning the required attendance at Alcoholics Anonymous meetings in-house if one is not an alcoholic, rarely even drinks, and the anonymity of such a meeting where residents are expected to bare a great deal to those with whom they also live, and my decision to read during one of the meetings, about which I'd been called in and "talked to" the following day. I was shouted at by Ms. Manigo-Murray at the mere request that a notation of "Not Applicable" be made, early on, next to the requirement that this meeting be attended.

3) Based upon this request, and some minor infraction of missed meetings, (due in part to attempts to retrieve some of my belonging to bring to the residence and taking care of the other business of getting settled without adequate transportation), was conflated into a presumption of guilt, by the Program Coordinator, of the more serious claim of violence by her house monitor, Victoria Peterson.

4) Calls were made to inform the Program Coordinator when I was stranded or unable to make a meeting on time. One of the missed meetings was simply an oversight due to the newness of the living situation, as well as the frequency of meetings.

5) The house monitor position is held by someone who is herself from the resident population chosen by Ms. Manigo-Murray--to my knowledge, an unpaid position—with ready access to the Program Coordinator's office where residents' confidential files are stored and is thereby allowed greater access to Ms. Manigo-Murray in her capacity as Program Coordinator of the Wright House, as well.

6) On the morning of August 9, 2001, upon my request that Ms. Peterson be required to come into the Program Coordinator's office, to seek fairness in the matter, she appeared in the doorway, and upon realizing it was not at Ms. Manigo-Murray's request said: "Oh I don't feel like being bothered," and was allowed to return to her room.

7) During my short, two-week stay at the Wright House, I was subjected to the "tyranny" and mean-spiritedness of several of the alcoholic residents, with no protection afforded me, as a non-alcoholic resident, by the Program Coordinator.

8) The "witness" Renee Albert was a known heroin addict at the residence, who was being questioned regarding her whereabouts (after purportedly attending AA meetings) by Peterson, *at the time of the alleged incident*. Although there was growing suspicion over several days' time about whether Ms. Albert was continuing to use drugs, it was revealed by the "assistant house monitor" that she could not be tested, as Wright House did not yet have their drug testing account in place with Baystate Labs. Her *entire account* of assault is fabricated.

9) Ms. Albert was a harasser by whom I had been accosted in the kitchen on more than one occasion, usually late at night when I'd gone down to the kitchen for or juice during a time when I thought the residence would be quiet. She frequently "stalked" the common areas and stayed up all hours of the night creating disturbances.

10) I spent most of the day of April 9, 2001, beginning shortly after meeting with Manigo-Murray until early afternoon, on a day when the temperature registered *105 degrees indoors*, with a debilitating medical condition that had me *seriously* anemic, weak, (so much so that it would have been foolhardy to attempt to "assault" anyone). In fact, my doctor had once told me I was so anemic I was in danger of slipping into coma. I was, consequently, more susceptible to heat prostration, while frantically calling about for another place to live on a moment's notice, and trying also to find out my rights in this matter.

11) Around 2:00 p.m., on August 9, 2001, Ms. Manigo-Murray's boss, Amy Toller, appeared inside Wright House. I introduced myself and asked whether we could talk. She agreed to, and immediately announced that she was five-year's in recovery. I told of my conversation with Ms. Manigo-Murray. She replied: "Oh Rena's not going to make you leave just like that if you don't have another place to live!" I breathed a sigh of relief, but only for about 20 minutes. Meanwhile Ms. Peterson is trumpeting her allegation about having been hit to Ms. Toller, while I am relaying the substance of my talk with Ms. Toller to Ms. Manigo-Murray, whose response is: "Okay, as long as we're on the same page. I don't want it to be thirty days." Moments later, she calls me in and saying "I've talked with Amy; you have until 5 p.m. tomorrow to find another place." Again without benefit of an in-house grievance procedure, or any attempt at a fair discussion with all parties present, I resume phone calls about a place.

12) On Friday, August 10, Ms. Toller calls for Ms. Manigo-Murray. I happen to answer her call, while using the phone for my search. I ask of her why her assurance that I would not be surreptitiously ejected without a place lined up to go was reneged upon. She replies, "That was before I knew there was physical violence."

13) All requests and any attempt at reasonableness and fairness are foreclosed upon. I call a lawyer. Via phone consultation, I explain what is happening, and it is suggested to me that since it is late (4:25 p.m on a Friday) with no time for an injunction, to inform the Police Department and explain to them that the Management is planning to forcibly remove me based on false allegations. The dispatcher takes my information and passes it along to the sergeant.

14) At about 4:45p.m, Ms. Manigo-Murray calls me into her office to introduce me to a woman by the name of (Mary Leoni) who is "...here to help me find another place." This is someone who is, to my understanding, hired to help residents procure long-term housing (not shelter stays), and assist with the employment search. This is my first meeting her in my two weeks there. After a half-hour talk, she concludes that I "don't need a program, just a job and my own place," which is what I had told Ms. Manigo-Murray from the outset--along with the stability required to immediately address an acute medical condition.

15) She now offered to "work something out for me" with Ms. Manigo-Murray. Meantime, a man by the name of "John" appeared from one of SMOC's other offices in Springfield. I was

summoned into Ms. Manigo-Murray's office and told this person is "here to take me to a shelter in Springfield," without any prior introduction or opportunity to speak with him myself. My first impression of him was one of hostility as he immediately gets on the telephone to the police, whom I have already notified of the situation, and accuses me of trespassing because I refuse to head off to a shelter with him, citing this was not in the agreement I signed and having done nothing wrong, I see no reason to rush off with him.

16) Two officers arrive around 6:00 p.m—one of whom is the sergeant that responded to my earlier call. I ask whether we can go on to the enclosed porch, and sit down to talk quietly, rather than standing around in the front yard. He agreed. I request that Ms. Manigo-Murray be present, as she is the one in charge of the program and required to be there on a daily basis, and was the only one I had heard trumpeting the allegation, thus far. Again, I asked that Victoria Peterson be present, to no avail. (*To date, I have not heard allegation, or read a signed statement of it anywhere from the supposed accuser(s).* Also, for all the trumpeting of an alleged "assault" at the residence, complete with "witness," no police report of any kind was filed; nor even was a call placed to the Police Department on the eve of the alleged event

17) In the absence of access to a grievance procedure, I seek the chance to state my side in Ms. Manigo-Murray's presence, with what I hoped would be an outside and objective party. I requested also that we all be seated, (also pulling up a chair for Ms. Manigo-Murray), as I realized that with five persons—three of them SMOC's officers and only the one advocate in my behalf being myself, some intimidation tactics might be employed. The sergeant was able to elicit from Ms. Manigo-Murray, right away, during the meeting that there was indeed an in-house grievance procedure.

18) When I asked whether I might file at that time, I was told, "At the Springfield shelter." I inquired as to why I should be booted out without due process, and was told SMOC was providing me with a clean place to go "*just for the night.*" (Furthermore, I had been told by residents at Wright House who had stayed at this particular shelter that it was neither clean nor safe).

19) I again called the law office, and was told that if there was no warrant, I should remain at Wright House as previously instructed by counsel, I relayed the message that I was remaining there and informed them of my reason—that I already had a clean place here and had done nothing wrong--whereupon the officer's departed.

20) After congregating in the living room for about twenty minutes, SMOC representatives departed also.

21) Without assistance on the part of the employment/housing coordinator, I found employment the following day (Saturday, August 11, 2001). The weekend is pretty much without incident, as is Monday night upon my return from my second day at work...

22) On the eve of Tuesday, August 14, I arrive home from work at about 7:15p.m. As I am preparing to eat, a man appears immediately from behind, with an order of trespass, asks my name and says he is "just doing his job." Ms. Manigo-Murray appears right after and says "They don't want you here." She proceeds to tell me to pack my things, while looking at her watch. She threatens to call the police. I am extremely fatigued from anemia and having had a health scare with the 113 degree heat-wave of the previous week, I do not want to relive the ordeal of Friday eve. Nor do I subject my self to further abuse and disrespect at the hands of SMOC's representatives. I ask that she call a cab for me, though I have not received my first pay and have no cash. The Program Coordinator makes no offer to help with transportation, even though it is late and after dark when the taxi arrives, and there is not even public transit available.

23) At the time of my arrival at Wright House, unfamiliar with the lexicon of the "recovery movement," I did not understand the term "sober house" to mean a resident population made up of predominantly of substance abusers. I interpreted it to mean "No drinking allowed on the premises." Rather, I was led to believe through a flier and in an interview, that Wright House was "a transitional program for homeless women." and that "the program was designed to assist *displaced* women in securing permanent housing." While it made mention of women with substance abuse problems, the words "sober house" were not used nor emphasized in the literature, nor were they used in the newspaper articles I later read about the Home. No indication was given in the interview that I, as someone who does not do drugs or abuse alcohol would be required to subordinate my own judgment about my health and well-being to the judgment of those still "in recovery," or that management would pander to the alcoholic population (seemingly because of their greater number) at the expense of the health and safety and of the residents who were not, to remain in the Wright House.

24) With regard to SMOC's offer of an apartment, as mentioned in SMOC'S letter of May 10, 2002: after I had been threatened, coerced, had the police called on me, been served by a sheriff and ejected from the residence into the night, Ms. Leoni again met with me to discuss SMOC's offer, (which *offer* never came up on the day of all the threats and intimidation), through a subsidy that is mandated for alcoholics in recovery. I feared first, I would find myself in a situation where I would be presumed to be--or treated like--an alcoholic or substance abuser by SMOC'S agents and handlers who might somehow, once again, find a way to "snatch the rug out from under me," and I would be suddenly without housing again. The offer was contingent upon my allowing Ms. Leoni, (who mentioned in our conversation, that she was a former corrections officer), to "check up on me." Since I am neither an alcoholic nor a criminal, and have never been, coupled with the experiences I had just undergone at the hands of the alcoholics and substance abusers in "recovery" at the Wright House, including the Director, I declined.

25) The actions of "trespassing" and threatening me with arrest if I did not leave constitute "threats, intimidation or coercion" under Massachusetts' Civil Rights Act, G.L. c. 12, &III, see generally Bally v. Northeastern University, 403 Mass. 713, 718-720 (1989). Violation of Article 11 of the Massachusetts Declaration of Rights in that I was not provide sufficient hearing to address the allegations, M.G.L. c. 12 section 11H and 11I. And DEPRIVATION OF CIVIL RIGHTS BY A PERSON ACTING UNDER COLOR OF STATE LAW IN VIOLATION OF TITLE 42, U.S.C. 198 Further, having suffered damages including, but not limited to severe emotional distress, embarrassment, harassment, loss of an opportunity at a *critical juncture* to address a debilitating health condition, I suffered and continue to suffer a subsequent decline in health, (because a postponement of treatment), and displacement.

WHEREFORE, I, Karen Unaka, as plaintiff in this matter, pray that the Court find that the defendants have violated my rights under the United States Constitution and the Massachusetts Declaration of Rights, award damages, plus costs and attorney fees, and the Court grant injunctive relief and any further or additional relief as it deems fair and just.

Signed__________________________

Karen Unaka
41 Valley Street
Northampton, MA 01060

Dated: August 9, 2001

9

04 4193

CERTIFICATE OF SERVICE

I, Karen Unaka, hereby certify that copies of Complaint for Judicial Review were mailed to the Department of Transitional Assistance and the Attorney General's Office by first class mail, postage paid, to :

Department of Transitional Assistance
600 Washington Avenue
Boston, MA 02111

and

Office of the Attorney General
One Ashburton Place
Boston, MA 02108

Karen Unaka
March 10, 2005

2005 MAR 14 A 9:16
HAMPSHIRE SUPERIOR CRT
HARRY JEKANOWSKI JR
CLERK

7

COMMONWEALTH OF MASSACHUSETTS
HAMPSHIRE, SS.

Superior Court Department of the Trial Court of the Commonwealth
Civil Action

04 193

No. 04193

Karen Unaka, Plaintiff (s)

v.

Amy Toller, Defendant (s)

SUMMONS

2005 FEB 11 A 9:01

To the above-named Defendant :

You are hereby summoned and required to serve upon ,
plaintiff attorney, whose address is ,
an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Northampton, either before service upon plaintiff attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff claim or you will thereafter be barred from making such claim in any other action.

Witness, Barbara J. Rouse, Esquire at Northampton, the
day of , in the year of our Lord two thousand

Harry Jekanowski, Jr.

CLERK-MAGISTRATE

NOTICE TO DEFENDANT - You need not appear personally in court to answer the complaint but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

NOTES:
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.
3. Circle type of action involved. Tort – Motor Vehicle Tort – Contract – Equitable relief.

PROOF OF SERVICE OF PROCESS



**Office of the Sheriff** • **P.O. Box 684** • **Northampton, MA 01061** • **585-0618**

***Hampshire, ss.***

February 8, 2005

I hereby certify and return that on 2/7/2005 at 01:45 pm I served a true and attested copy of the SUMMONS & AMENDED COMPLAINT in this action in the following manner: To wit, by delivering in hand to BECCA SMALL, PROGRAM CO-ORDINATOR FOR AMY TOLLER at WRIGHT HOME FOR WOMEN, 305 MAIN STREET, EASTHAMPTON, MA 01027. In the service hereof, it was necessary and I actually used a motor vehicle 12 miles. Basic Service in hand ($30.00), Conveyance ($1.80), Travel ($3.84), Copies ($2.00), Attest ($5.00) Total Charges $42.64

Deputy Sheriff GEORGE SYMBORSKI

[signature] Deputy Sheriff

Dated: , 20 .

N.B. TO PROCESS SERVER:–

PLEASE PLACE DATE YOU MAKE SERVICE ON DEFENDANT IN THIS BOX ON THE ORIGINAL AND ON COPY SERVED ON DEFENDANT.

| , 20 . |
|---|

Commonwealth of Massachusetts

HAMPSHIRE, ss. SUPERIOR COURT
CIVIL ACTION
No.

Plff.

v.

Deft.

**SUMMONS**
(Mass. R. Civ. P. 4)

2



COMMONWEALTH OF MASSACHUSETTS

HAMPSHIRE , ss. ) SUPERIOR COURT NORTHAMPTON DIVISION DOCKET NO.

04 193

KAREN UNAKA
Plaintiff

vs.

SOUTH MIDDLESEX OPPORTUNITY COUNCIL
Bruce S. Hulme, President & Relevant Parties
Defendants

2004 AUG 13 P 4: 04
HAMPSHIRE SUPERIOR CRT
HARRY JEKANOWSKI JR
CLERK

1 The Plaintiff, KAREN UNAKA is an individual, and former resident of Wright House Easthampton, MA, Hampshire County

2 The Defendant, SOUTH MIDDLESEX OPPORTUNITY COUNCIL, Administrative Offices located at 300 Howard Street Framingham, MA, owner and operator of Wright Home for Women, Easthampton MA, Hampshire County

3 Defendant, RENA MANIGO-MURRAY, Program Coordinator, Wright House for Women

4 Defendant, AMY TOLLER, Director, Wright House for Women

5 Defendant, VICTORIA PETERSON, House Monitor/Resident, Wright House for Women

6 Defendant, RENEE ALBERT, Resident, Wright House for Women

All Other Relevant Authorized South Middlesex Opportunity Council Officers Involved in Actions in Violation of the Rights of Plaintiff, Ms. Karen Unaka in the Matter of August 9-14, 2001.

COMPLAINT AND JURY DEMAND

Overview

Beginning on or about July 27, 2004 until August 14, 2001 I, Karen Unaka, was a resident at the Wright Home for Women in Easthampton, MA, a transitional housing program owned and operated by South Middlesex Opportunity Council (SMOC). My stay there was necessitated by the loss of my long-term rental housing after sale by the owner and an acute medical condition, which needed *immediate* action. Upon my arrival, I made it clear to Program Coordinator, Ms. Manigo-Murray that I did not abuse alcohol or drugs, and asked that this be noted in my file—rather my circumstances necessitated a transitional living arrangement so that I could become re-employed and re-housed, while pursuing a plan of action for my health. All that I asked for was a clean, quiet, stable environment in which to do so. I was accepted into the residence with the understanding that my stay would be a maximum of nine months with a 100% rental subsidy. I was forcibly removed without due process of law, based on the false allegations of another resident who was a known alcoholic and substance abuser, allowed to act as "house monitor" by the Program Coordinator, Rena Manigo-Murray. Allegations were subsequently trumpeted by the Program Coordinator, without benefit of any

grievance procedure whatsoever, and with the support of a "witness" who was also a known substance abuser with a heroin addiction, under suspicion of continued alcohol use while in residence. Nor were either of these parties—the accuser and the "witness" required to be present at the time that I was informed of the allegation by the Program Coordinator. I had an acute medical condition for which I needed an immediate operation and thought this a stable place to live and enough time allotted in which to address the problem. Further, I thought if I simply focused, and a set my own "program" goals for getting back to health, I would be left in peace by other residents, despite their addictions. Instead I found myself swept up in a maelstrom of false accusations by substance abusers, and was subsequently returned to the very situation I came to Wright House in search of a resolution for. With my ouster, I had to postpone my operation for many months, while addressing the immediacy ofmy housing dilemma. My health suffered as a result.

Statement of Facts

1) On morning of Thursday, August 9, 2001, Program Coordinator at the Wright Home for Women, Rena Manigo-Murray called me into her office and accusing me of "striking" her "house monitor," Victoria Peterson. This is my first hearing of this. I attempt to discuss the matter, but she has already made up her mind. I am told to find another place by five o'clock. that day. Her response, at my request that the accuser be present and to my denial of this accusation, is to sit stony-faced and repeat, "Yeah, we've had some problems before."

2) The problem has been my questioning the required attendance at Alcoholics Anonymous meetings in-house if one is not an alcoholic, rarely even drinks, and the anonymity of such a meeting where residents are expected to bare a great deal to those with whom they also live, and my decision to read during one of the meetings, about which I'd been called in and "talked to" the following day. I was shouted at by Ms. Manigo-Murray at the mere request that a notation of "Not Applicable" be made, early on, next to the requirement that this meeting be attended.

3) Based upon this request and some minor infractions of missed meetings, (due in part to attempts to retrieve some of my belonging to bring to the residence and taking care of the other business of getting settled without adequate transportation), was conflated into a presumption of guilt, by the Program Coordinator, of the more serious claim of violence by her house monitor, Victoria Peterson.

4) Calls were made to inform the Program Coordinator when I was stranded or unable to make a meeting on time. One of the missed meetings was simply an oversight due to the newness of the living situation, as well as the frequency of meetings.

5) The house monitor position is held by someone who is herself from the resident population chosen by Ms. Manigo-Murray--to my knowledge, an unpaid position—with ready access to the Program Coordinator's office where residents' confidential files are stored and is thereby allowed greater access to Ms. Manigo-Murray's in her capacity as Program Coordinator of the Wright House, as well.

6) On the morning of August 9, 2001, upon my request that Ms. Peterson be required to come into the Program Coordinator's office, to seek fairness in the matter, she appeared in the doorway, and upon realizing it was not at Ms. Manigo-Murray's request said: "Oh I don't feel like being bothered," and was allowed to return to her room.

7) During my short, two-week stay at the Wright House, I was subjected to the "tyranny" and mean-spiritedness of several of the alcoholic residents, with no protection afforded me, as a non-alcoholic resident, by the Program Coordinator.

8) The "witness" Renee Albert was a known heroin addict at the residence, who was being questioned regarding her whereabouts (after purportedly attending AA meetings) by Peterson, *at the time of the alleged incident.* Although there was growing suspicion over several days' time about whether Ms. Albert was continuing to use drugs, it was revealed by the "assistant house monitor" that she could not be tested, as Wright House did not yet have their drug testing account in place with Baystate Labs. Her *entire account* is of assault is fabricated.

9) Ms. Albert was a harasser by whom I had been accosted in the kitchen on more than one occasion, usually late at night when I'd gone down to the kitchen for or juice during a time when I thought the residence would be quiet. She frequently "stalked" the common areas and stayed up all hours of the night creating disturbances.

10) I spent most of the day of April 9, 2001, beginning shortly after meeting with Manigo-Murray until early afternoon, on a day when the temperature registered *105 degrees indoors*, with a debilitating medical condition that had me *seriously* anemic, weak, (so much so that it would have been foolhardy to attempt to "assault" anyone). In fact, my doctor had once told me I was so anemic I was in danger of slipping into coma. I was, consequently, more susceptible to heat prostration, while frantically calling about for another place to live on a moment's notice, and trying also to find out my rights in this matter.

11) Around 2:00 p.m., on August 9, 2001, Ms. Manigo-Murray's boss, Amy Toller, appeared inside Wright House. I introduced myself and asked whether we could talk. She agreed to, and immediately announced that she was five-year's in recovery. I told of my conversation with Ms. Manigo-Murray. She replied: "Oh Rena's not going to make you leave just like that if you don't have another place to live!" I breathed a sigh of relief, but only for about 20 minutes. Meanwhile Ms. Peterson is trumpeting her allegation about having been hit to Ms. Toller, while I am relaying the substance of my talk with Ms. Toller to Ms. Manigo-Murray, whose response is: "Okay, as long as we're on the same page. I don't want it to be thirty days." Moments later, she calls me in and saying "I've talked with Amy; you have until 5 p.m. tomorrow to find another place." Again without benefit of an in-house grievance procedure, or any attempt at a fair discussion with all parties present, I resume phone calls about a place.

12) On Friday, August 10, Ms. Toller calls for Ms. Manigo-Murray. I happen to answer her call, while using the phone for my search. I ask of her why her assurance that I would not be surreptitiously ejected without a place lined up to go was reneged upon. She replies, "That was before I knew there was physical violence."

13) All requests and any attempt at reasonableness and fairness are foreclosed upon. I call a lawyer. Via phone consultation, I explain what is happening, and it is suggested to me that since it is late (4:25 p.m on a Friday) with no time for an injunction, to inform the Police Department and explain to them that the Management is planning to forcibly remove me based on false allegations. The dispatcher takes my information and passes it along to the sergeant.

14) At about 4:45p.m, Ms. Manigo-Murray calls me into her office to introduce me to a woman by the name of (Mary Leoni) who is "...here to help me find another place." This is someone who is, to my understanding, hired to help residents procure long-term housing (not shelter stays), and assist with the employment search. This is my first meeting her in my two weeks there. After a half-hour talk, she concludes that I "don't need a program, just a job and my own place," which is what I had told Ms. Manigo-Murray from the outset--along with the stability required to immediately address an acute medical condition.

15) She now offered to "work something out for me" with Ms. Manigo-Murray. Meantime, a man by the name of "John" appeared from one of SMOC's other offices in Springfield. I was

summoned into Ms. Manigo-Murray's office and told this person is "here to take me to a shelter in Springfield," without any prior introduction or opportunity to speak with him myself. My first impression of him was one of hostility as he immediately gets on the telephone to the police, whom I have already notified of the situation, and accuses me of trespassing because I refuse to head off to a shelter with him, citing this was not in the agreement I signed and having done nothing wrong, I see no reason to rush off with him.

16) Two officers arrive around 6:00 p.m—one of whom is the sergeant that responded to my earlier call. I ask whether we can go on to the enclosed porch, and sit down to talk quietly, rather than standing around in the front yard. He agreed. I request that Ms. Manigo-Murray be present, as she is the one in charge of the program and required to be there on a daily basis, and was the only one I had heard trumpeting the allegation, thus far. Again, I asked that Victoria Peterson be present, to no avail. (*To date, I have not heard allegation, or read a signed statement of it anywhere from the supposed accuser(s).* Also, for all the trumpeting of an alleged "assault" at the residence, complete with "witness," no police report filed of any kind was filed; nor even was a call placed to the Police Department on the eve of the alleged event

17) In the absence of access to a grievance procedure, I seek the chance to state my side in Ms. Manigo-Murray's presence, with what I hoped would be an outside and objective party. I requested also that we all be seated, (also pulling up a chair for Ms. Manigo-Murray), as I realized that with five persons—three of them SMOC's officers and only the one advocate in my behalf being myself, some intimidation tactics might be employed. The sergeant was able to elicit from Ms. Manigo-Murray, right away, during the meeting that there was indeed an in-house grievance procedure.

18) When I asked whether I might file at that time, I was told, "At the Springfield shelter." I inquired as to why I should be booted out without due process, and was told SMOC was providing me with a clean place to go "*just for the night.*" (Furthermore, I had been told by residents at Wright House who had stayed at this particular shelter that it was neither clean nor safe).

19) I again called the law office, and was told that if there was no warrant, I should remain at Wright House as previously instructed by counsel, I relayed the message that I was remaining there and informed them of my reason—that I already had a clean place here and had done nothing wrong--whereupon the officer's departed.

20) After congregating in the living room for about twenty minutes, SMOC representatives departed also.

21) Without assistance on the part of the employment/housing coordinator, I found employment the following day (Saturday, August 11, 2001), The weekend is pretty much without incident, as is Monday night upon my return from my second day at work.

22) On the eve of Tuesday, August 14, I arrive home from work at about 7:15p.m. As I am preparing to eat, a man appears immediately from behind, with an order of trespass, asks my name and says he is "just doing his job." Ms. Manigo-Murray appears right after and says "They don't want you here." She proceeds to tell me to pack my things, while looking at her watch. She threatens to call the police. I am extremely fatigued from anemia and having had a health scare with the 113 degree heat-wave of the previous week, I do not want to relive the ordeal of Friday eve. Nor do I subject my self to further abuse and disrespect at the hands of SMOC's representatives. I ask that she call a cab for me, though I have not received my first pay and have no cash. The Program Coordinator makes no offer to help with transportation, even though it is late and after dark when the taxi arrives, and there is not even public transit available.

23) At the time of my arrival at Wright House, unfamiliar with the lexicon of the "recovery movement," I did not understand the term "sober house" to mean a resident population made up of predominantly of substance abusers. I interpreted it to mean "No drinking allowed on the premises." Rather, I was led to believe through a flier, and in an interview that Wright House was "a transitional program for homeless women." and that "the program was designed to assist *displaced* women in securing permanent housing." While it made mention of women with substance abuse problems, the words "sober house" were not used nor emphasized in the literature, nor were they used in the newspaper articles I later read about the Home. No indication was given in the interview that I, as someone who does not do drugs or abuse alcohol would be required to subordinate my own judgment about my health and well-being to the judgment of those still "in recovery," or that management would pander to the alcoholic population (seemingly because of their greater number) at the expense of the health and safety and of the residents who were not, to remain in the Wright House.

24) With regard to SMOC's offer of an apartment, as mentioned in SMOC'S letter of May 10, 2002: after I had been threatened, coerced, had the police called on me, been served by a sheriff and ejected from the residence into the night, Ms. Leoni again met with me to discuss SMOC's offer, (which *offer* never came up on the day of all the threats and intimidation), through a subsidy that is mandated for alcoholics in recovery. I feared first, I would find myself in a situation where I would be presumed to be--or treated like--an alcoholic or substance abuser by SMOC'S agents and handlers who might somehow, once again, find a way to "snatch the rug out from under me," and I would be suddenly without housing again. The offer was contingent upon my allowing Ms. Leoni, (who mentioned in our conversation, that she was a former corrections officer), to "check up on me." Since I am neither an alcoholic nor a criminal, and have never been, coupled with the experiences I had just undergone at the hands of the alcoholics and substance abusers in "recovery" at the Wright House, including the Director, I declined.

25) The actions of "trespassing" and threatening me with arrest if I did not leave constitute "threats, intimidation or coercion" under Massachusetts' Civil Rights Act, G.L. c. 12, &III, see generally Bally v. Northeastern University, 403 Mass. 713, 718-720 (1989). Violation of Article 11 of the Massachusetts Declaration of Rights in that I was not provide sufficient hearing to address the allegations, M.G.L. c. 12 section 11H and 11I. And DEPRIVATION OF CIVIL RIGHTS BY A PERSON ACTING UNDER COLOR OF STATE LAW IN VIOLATION OF TITLE 42, U.S.C. 198 Further, having suffered damages including, but not limited to severe emotional distress, embarrassment, harassment, loss of an opportunity at a *critical juncture* to address a debilitating health condition, I suffered and continue to suffer a subsequent decline in health, (because a postponement of treatment), and displacement.

WHEREFORE, I, Karen Unaka, as plaintiff in this matter, pray that the Court find that the defendants have violated my rights under the United States Constitution and the Massachusetts Declaration of Rights, award damages, plus costs and attorney fees, and the Court grant injunctive relief and any further or additional relief as it deems fair and just.

Signed K Unaka

Karen Unaka
41 Valley Street
Northampton, MA 01060
413/584.2628

Dated: August 9, 2001

6

COMMONWEALTH OF MASSACHUSETTS
SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

HAMPSHIRE, SS

NORTHAMPTON DIVISION
CIVIL ACTION NO. 04-193

KAREN UNAKA,

Plaintiff,

V.

SOUTH MIDDLESEX OPPORTUNITY COUNCIL, Bruce S. Hulme, President and Relevant Parties,

Defendants.

HAMPSHIRE SUPERIOR CRT
HARRY JEKANOWSKI JR
CLERK
2005 FEB -1 A 8: 39

**ANSWER OF DEFENDANT SOUTH MIDDLESEX OPPORTUNITY COUNCIL, INC. AND BRUCE S. HULME[1]**

The defendants, South Middlesex Opportunity Council, Inc. ("SMOC") and Bruce S. Hulme, hereby answers the plaintiff's Complaint, paragraph by paragraph, as follows:

1. Defendants admit that plaintiff is a former program participant of the Wright Home for Women in Easthampton, Hampshire County, Massachusetts. Defendants deny the remaining allegations contained in paragraph 1.

2. Admitted.

3. Defendants admit that Rena Manigo-Murray was formerly a Program Coordinator for the Wright Home for Women. Defendants deny the remaining allegations contained in paragraph 3.

[1] It is unclear whether Bruce S. Hulme is a party to this lawsuit as no allegations appear to be asserted against him. However, as he is named in the caption and was served with process, in an overabundance of caution, his answer is filed herewith.

4. Defendants admit that Amy Toller is the Director for Statewide Homeless Services, including the Wright Home for Women. Defendants deny the remaining allegations contained in paragraph 4.

5. Defendant are unable to admit or deny the allegations contained in paragraph 5 due to program participant confidentiality including, without limitation, the confidentiality of treatment records mandated by G.L. c. 111B, § 10, 42 U.S.C. § 290dd-2 and 42 C.F.R. § § 2.1 et seq.

6. Defendant are unable to admit or deny the allegations contained in the first sentence of paragraph 6 due to program participant confidentiality including, without limitation, the confidentiality of treatment records mandated by G.L. c. 111B, § 10, 42 U.S.C. § 290dd-2 and 42 C.F.R. § § 2.1 et seq. The remainder of paragraph 6 does not identify any particular individuals or otherwise set forth any factual allegations and, as such, no response is required. To the extent that a response is required, defendants deny the remaining allegations contained in paragraph 6.

Overview

Defendants state that plaintiff's "overview" is a narrative summary to which no response is required. To the extent that a response is required, plaintiff's "overview" is denied.

**STATEMENT OF FACTS**

1. Defendants admit that on August 9, 2001, the Program Coordinator for the Wright Home for Women, Rena Manigo-Murray, informed plaintiff that she was terminated from the program and would be required to vacate the premises by 5:00 p.m. on August 10, 2001. Answering further, defendants state that plaintiff was terminated from the program because she had physically assaulted two other program participants and had repeatedly violated house rules.

Defendants are without information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in paragraph 1.

2. Defendants admit that plaintiff requested that she not be required to attend recovery meetings. Answering further, defendants state that plaintiff was told that all house meetings and workshops were mandatory and plaintiff accepted this by signing an agreement to abide by house rules. Defendants deny the remaining allegations contained in paragraph 2.

3. Defendants admit that plaintiff violated house rules on numerous occasions by missing mandatory house meetings. Defendants are without information sufficient to form a belief as to the truth or falsity of the plaintiff's allegations regarding her attempts to retrieve her belongings. Defendants deny the remaining allegations contained in paragraph 3.

4. Defendants admit that plaintiff called the Program Coordinator on one occasion about missing a mandatory house meeting. Answering further, defendants state that plaintiff missed other mandatory house meetings without any advance phone call to the Program Coordinator. Defendants are without information sufficient to form a belief as to the truth or falsity of the plaintiff's allegations regarding her reasons for missing a house meeting. Defendants deny the remaining allegations contained in paragraph 4.

5. Defendants admit that the position of House Manager is held by a program participant and that it is a volunteer position. Answering further, defendants state that the House Manager is selected by both the Program Coordinator and Director of Statewide Homeless Services. Defendants deny the remaining allegations contained in paragraph 5.

6. Defendants are unable to admit or deny the allegations contained in paragraph 6 due to program participant confidentiality including, without limitation, the confidentiality of

treatment records mandated by G.L. c. 111B, § 10, 42 U.S.C. § 290dd-2 and 42 C.F.R. § § 2.1 et seq.

7. Denied.

8. Defendants are unable to admit or deny the allegations contained in paragraph 8 due to program participant confidentiality including, without limitation, the confidentiality of treatment records mandated by G.L. c. 111B, § 10, 42 U.S.C. § 290dd-2 and 42 C.F.R. § § 2.1 et seq.

9. Defendants are unable to admit or deny the allegations contained in paragraph 5 due to program participant confidentiality including, without limitation, the confidentiality of treatment records mandated by G.L. c. 111B, § 10, 42 U.S.C. § 290dd-2 and 42 C.F.R. § § 2.1 et seq. Answering further, defendants states that plaintiff never reported to defendants that she was accosted by another program participant or that she was otherwise being stalked or harassed by another program participant.

10. Defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 10.

11. Defendants admit that on August 9, 2001, the Director of Statewide Homeless Services, Amy Toller, met with the plaintiff and listened to her account of the incident and further admits that plaintiff was informed that she would be required to vacate the premises by 5:00 p.m. on August 10, 2001. Defendants deny the remaining allegations contained in paragraph 11.

12. Defendants admit that Amy Toller spoke with plaintiff on the telephone. Answering further, defendants state that Amy Toller explained to plaintiff that the reason she had

to leave the program was because of the physical violence toward other program participants. Defendants deny the remaining allegations contained in paragraph 12.

13. Defendants are without information sufficient to form a belief as to the truth or falsity of the plaintiff's allegations regarding the substance of her conversations with her attorney and the police. Defendants deny the remaining allegations contained in paragraph 13.

14. Defendants admit that Rena Manigo-Murray and SMOC's Housing Specialist, Mary Leone, assisted plaintiff with alternative housing, which specifically included both short term and long term placements. Answering further, defendants state that plaintiff failed to sign up for a meeting with Mary Leone during her stay at the Wright Home for Women despite having had an opportunity to do so. Defendants are without information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in paragraph 14.

15. Defendants are without information sufficient to form a belief as to the truth or falsity of the plaintiff's allegations regarding statements made by Mary Leone. Defendants admit that John Curtin, the Program Coordinator for another SMOC program, arrived to assist plaintiff with alternative housing and to provide plaintiff with transportation to a housing placement that defendants had secured for plaintiff. Defendants further admit that John Curtin spoke with police on this occasion. Defendants are without information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in paragraph 15.

16. Defendants admit that the police arrived at the Wright Home for Women on or about August 10, 2001. Answering further, defendants state that the police were called because plaintiff refused to leave the property. Defendants further state that the program participants who had been assaulted by plaintiff expressed being in fear of their lives and refused to press

charges against plaintiff. Defendants are without information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in paragraph 16.

17. Defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 17.

18. Defendants deny the allegations contained in paragraph 18. Answering further, defendants state that plaintiff did receive the benefit of a grievance procedure and defendant did secure for plaintiff an appropriate housing placement.

19. Defendants admit that plaintiff refused to leave the Wright Home for Women despite the fact that she had been terminated from the program. Defendants are without information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in paragraph 19.

20. Defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 20.

21. Defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 21.

22. Defendants admit that SMOC caused plaintiff to be served with a notice of trespass at approximately 7:30 p.m. on August 14, 2001 and that plaintiff was advised to pack her personal belongings. Answering further, defendant, state that the Program Coordinator called the plaintiff a taxi cab and that plaintiff departed the premises at approximately 8:30 p.m. Defendants are without information sufficient to form a belief as to the truth or falsity of the plaintiff's allegations regarding her medical condition. Defendants deny the remaining allegations contained in paragraph 22.

23. Defendants are without information sufficient to form a belief as to the truth or falsity of the plaintiff's allegations regarding what plaintiff believed. Defendants deny the remaining allegations contained in paragraph 23. Answering further, defendants state that plaintiff was advised of the mandatory attendance at all house meetings and workshops, including recovery meetings, and that plaintiff understood and accepted this as evidenced by her signed agreement of the house rules.

24. Defendants admit that Mary Leone secured permanent housing for plaintiff, but denies that such housing was contingent on allowing Ms. Leone to check up on plaintiff. Defendants deny that plaintiff was threatened, coerced or otherwise intimidated. Defendants are without information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in paragraph 24.

25. Denied.

WHEREFORE, the defendants deny that plaintiff is entitled to any form of relief and demands that plaintiff's Complaint be dismissed with an award of attorneys' fees and costs in its favor.

FIRST AFFIRMATIVE DEFENSE

Plaintiff has failed to state a cause of action upon which relief can be granted.

SECOND AFFIRMATIVE DEFENSE

This action is barred by the applicable statute of limitations.

THIRD AFFIRMATIVE DEFENSE

Plaintiff comes before this Court with unclean hands.

FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by principles of laches.

FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by principles of estoppel.

SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred for insufficient service of process.

SEVENTH AFFIRMATIVE DEFENSE

This is action is barred due to misnomer of a party.

SOUTH MIDDLESEX OPPORTUNITY COUNCIL, INC. and BRUCE S. HULME

By their attorney,

Marisa L. Pizzi (BBO # 637383)
John H. Perten (BBO#548728)
Bowditch & Dewey, LLP
161 Worcester Road
P. O. Box 9320
Framingham, MA 01701
(508) 879-5700

Date: January 31, 2005

CERTIFICATE OF SERVICE

I, John H. Perten, Esq. hereby certify and say that on this 31 th day of January, 2005, I served a copy of the Answer of Defendant South Middlesex Opportunity Council, Inc., and Bruce S. Hulme by mailing a copy thereof, postage paid, to:

Karen Unaka
P.O. Box 754
Hadley, MA 01035

John H. Perten, Esq.

{}

4

1

04 193

COMMONWEALTH OF MASSACHUSETTS

| | | |
|---|---|---|
| HAMPSHIRE, ss. | ) | SUPERIOR COURT<br>NORTHAMPTON DIVISION<br>DOCKET NO. 04 193 |
| KAREN UNAKA<br>Plaintiff | ) | |
| vs. | ) | |
| SOUTH MIDDLESEX OPPORTUNITY COUNCIL | ) | |

HAMPSHIRE SUPERIOR COURT
HARRY JEKANOWSKI
CLERK
2005 JAN -7 P 4:

The Plaintiff, KAREN UNAKA is an individual and former resident of Wright Home for Women, 305 Main Street, Easthampton, MA, Hampshire County

1) Defendant, SOUTH MIDDLESEX OPPORTUNITY COUNCIL, Administrative Offices located at 300 Howard Street, Framingham, MA - Owner and Operator of Wright Home for Women located at 305 Easthampton MA, Hampshire County

2) Defendant, BRUCE S. HULME, President, South Middlesex Opportunity Council

3) Defendant, RENA MANIGO-MURRAY, Program Coordinator, Wright Home for Women, 305 Main Street, Easthampton, MA

4) Defendant, AMY TOLLER, Director, Wright Home for Women

AMENDED COMPLAINT AND JURY DEMAND

Overview

Beginning on or about July 27, 2004 until August 14, 2001 I, Karen Unaka, was a resident at the Wright Home for Women in Easthampton, MA, a transitional housing program owned and operated by South Middlesex Opportunity Council (SMOC). My stay there was necessitated by the loss of my long-term rental housing after sale by the owner and an acute medical condition, which needed *immediate* action. Upon my arrival, I made it clear to Program Coordinator, Ms. Manigo-Murray that I did not abuse alcohol or drugs, and asked that this be noted in my file—rather my circumstances necessitated a transitional living arrangement so that I could become re-employed and re-housed, while pursuing a plan of action for my health. All that I asked for was a clean, quiet, stable environment in which to do so. I was accepted into the residence with the understanding that my stay would be a maximum of nine months with a 100% rental subsidy. I was forcibly removed without due process of law, based on the false allegations of another resident who was a known alcoholic and substance abuser, allowed to act as "house monitor" by the Program Coordinator, Rena Manigo-Murray. Allegations were subsequently trumpeted by the Program Coordinator, without benefit of any grievance procedure whatsoever, and with the support of a "witness" who was also a known substance abuser with a heroin addiction, under suspicion of continued alcohol use while in residence. Nor were either of these parties—the accuser and the "witness"--required to be present at the time that I was informed of the allegation by the Program Coordinator. I had an acute medical condition for which I

needed an immediate operation and thought this a stable place to live and enough time allotted in which to address the problem. Further, I thought if I simply focused, and a set my own "program" goals for getting back to health, I would be left in peace by other residents, despite their addictions. Instead I found myself swept up in a maelstrom of false accusations by substance abusers, and was subsequently returned to the very situation I came to Wright House in search of a resolution for. With my ouster, I had to postpone my operation for many months, while addressing the immediacy of my housing dilemma. My health suffered as a result.

Statement of Facts

1) On the morning of Thursday, August 9, 2001, Program Coordinator at the Wright Home for Women, Rena Manigo-Murray called me into her office and accused me of "striking" her "house monitor," Victoria Peterson. This is my first hearing of this. I attempt to discuss the matter, but she has already made up her mind. I am told to find another place by five o'clock that day. Her response, at my request that the accuser be present and to my denial of this accusation, is to sit stony-faced and repeat, "Yeah, we've had some problems before."

2) The problem has been my questioning the required attendance at Alcoholics Anonymous meetings in-house if one is not an alcoholic, rarely even drinks, and the anonymity of such a meeting where residents are expected to bare a great deal to those with whom they also live, and my decision to read during one of the meetings, about which I'd been called in and "talked to" the following day. I was shouted at by Ms. Manigo-Murray at the mere request that a notation of "Not Applicable" be made, early on, next to the requirement that this meeting be attended.

3) Based upon this request, and some minor infraction of missed meetings, (due in part to attempts to retrieve some of my belonging to bring to the residence and taking care of the other business of getting settled without adequate transportation), was conflated into a presumption of guilt, by the Program Coordinator, of the more serious claim of violence by her house monitor, Victoria Peterson.

4) Calls were made to inform the Program Coordinator when I was stranded or unable to make a meeting on time. One of the missed meetings was simply an oversight due to the newness of the living situation, as well as the frequency of meetings.

5) The house monitor position is held by someone who is herself from the resident population chosen by Ms. Manigo-Murray--to my knowledge, an unpaid position—with ready access to the Program Coordinator's office where residents' confidential files are stored and is thereby allowed greater access to Ms. Manigo-Murray in her capacity as Program Coordinator of the Wright House.

6) On the morning of August 9, 2001, upon my request that Ms. Peterson be required to come into the Program Coordinator's office, to seek fairness in the matter, she appeared in the doorway, and upon realizing it was not at Ms. Manigo-Murray's request said: "Oh I don't feel like being bothered," and was allowed to return to her room.

7) During my short, two-week stay at the Wright House, I was subjected to the "tyranny" and mean-spiritedness of several of the alcoholic residents, with no protection afforded me, as a non-alcoholic resident, by the Program Coordinator.

8) The "witness" Renee Albert was a known heroin addict at the residence, who was being questioned regarding her whereabouts (after purportedly attending AA meetings) by Peterson, *at the time of the alleged incident*. Although there was growing suspicion over several days' time about whether Ms. Albert was continuing to use drugs, it was revealed by the "assistant house

monitor" that she could not be tested, as Wright House did not yet have their drug testing account in place with Baystate Labs. Renee Albert's *entire account* of assault is fabricated.

9) Ms. Albert was a harasser by whom I had been accosted in the kitchen on more than one occasion, usually late at night when I'd gone down to the kitchen for or juice during a time when I thought the residence would be quiet. She frequently "stalked" the common areas and stayed up all hours of the night creating disturbances.

10) I spent most of the day of April 9, 2001, beginning shortly after meeting with Manigo-Murray until early afternoon, on a day when the temperature registered *105 degrees indoors*, with a debilitating medical condition that had me *seriously* anemic, weak, (so much so that it would have been foolhardy to attempt to "assault" anyone). In fact, my doctor had once told me I was so anemic I was in danger of slipping into coma. I was, consequently, more susceptible to heat prostration, while frantically calling about for another place to live on a moment's notice, and trying also to find out my rights in this matter.

11) Around 2:00 p.m., on August 9, 2001, Ms. Manigo-Murray's boss, Amy Toller, appeared inside Wright House. I introduced myself and asked whether we could talk. She agreed to, and immediately announced that she was five-year's in recovery. I told of my conversation with Ms. Manigo-Murray. She replied: "Oh Rena's not going to make you leave just like that if you don't have another place to live!" I breathed a sigh of relief, but only for about 20 minutes. Meanwhile Ms. Peterson is trumpeting her allegation about having been hit to Ms. Toller, while I am relaying the substance of my talk with Ms. Toller to Ms. Manigo-Murray, whose response is: "Okay, as long as we're on the same page. I don't want it to be thirty days." Moments later, she calls me in and saying "I've talked with Amy; you have until 5 p.m. tomorrow to find another place." Again without benefit of an in-house grievance procedure, or any attempt at a fair discussion with all parties present, I resume phone calls about a place.

12) On Friday, August 10, Ms. Toller calls for Ms. Manigo-Murray. I happen to answer her call, while using the phone for my search. I ask of her why her assurance that I would not be surreptitiously ejected without a place lined up to go was reneged upon. She replies, "That was before I knew there was physical violence."

13) All requests and any attempt at reasonableness and fairness are foreclosed upon. I call a lawyer. Via phone consultation, I explain what is happening, and it is suggested to me that since it is late (4:25 p.m on a Friday) with no time for an injunction, to inform the Police Department and explain to them that the Management is planning to forcibly remove me based on false allegations. The dispatcher takes my information and passes it along to the sergeant.

14) At about 4:45p.m, Ms. Manigo-Murray calls me into her office to introduce me to a woman by the name of (Mary Leoni) who is "...here to help me find another place." This is someone who is, to my understanding, hired to help residents procure long-term housing (not shelter stays), and assist with the employment search. This is my first meeting her in my two weeks there. After a half-hour talk, she concludes that I "don't need a program, just a job and my own place," which is what I had told Ms. Manigo-Murray from the outset--along with the stability required to immediately address an acute medical condition.

15) She now offered to "work something out for me" with Ms. Manigo-Murray. Meantime, a man by the name of "John" appeared from one of SMOC's other offices in Springfield. I was summoned into Ms. Manigo-Murray's office and told this person is "here to take me to a shelter in Springfield," without any prior introduction or opportunity to speak with him myself. My first impression of him was one of hostility as he immediately gets on the telephone to the police--whom I have already notified of the situation--and accuses me of trespassing because I refuse to

head off to a shelter with him, citing this was not in the agreement I signed and having done nothing wrong, I see no reason to rush off with him.

16) Two officers arrive around 6:00 p.m—one of whom is the sergeant that responded to my earlier call. I ask whether we can go on to the enclosed porch, and sit down to talk quietly, rather than standing around in the front yard. He agreed. I request that Ms. Manigo-Murray be present, as she is the one in charge of the program and required to be there on a daily basis, and was the only one I had heard trumpeting the allegation, thus far. Again, I asked that Victoria Peterson be present, to no avail. (*To date, I have not heard allegation, or read a signed statement of it anywhere from the supposed accuser(s).* Also, for all the trumpeting of an alleged "assault" at the residence, complete with "witness," no police report of any kind was filed; nor even was a call placed to the Police Department on the eve of the alleged event

17) In the absence of access to a grievance procedure, I seek the chance to state my side in Ms. Manigo-Murray's presence, with what I hoped would be an outside and objective party. I requested also that we all be seated, (also pulling up a chair for Ms. Manigo-Murray), as I realized that with five persons—three of them SMOC's officers and only the one advocate in my behalf being myself, some intimidation tactics might be employed. The sergeant was able to elicit from Ms. Manigo-Murray, right away, during the meeting that there was indeed an in-house grievance procedure.

18) When I asked whether I might file at that time, I was told, "At the Springfield shelter." I inquired as to why I should be booted out without due process, and was told SMOC was providing me with a clean place to go "*just for the night.*" (Furthermore, I had been told by residents at Wright House who had stayed at this particular shelter that it was neither clean nor safe).

19) I again called the law office, and was told that if there was no warrant, I should remain at Wright House as previously instructed by counsel, I relayed the message that I was remaining there and informed them of my reason—that I already had a clean place here and had done nothing wrong--whereupon the officer's departed.

20) After congregating in the living room for about twenty minutes, SMOC representatives departed also.

21) Without assistance on the part of the employment/housing coordinator, I found employment the following day (Saturday, August 11, 2001). The weekend is pretty much without incident, as is Monday night upon my return from my second day at work...

22) On the eve of Tuesday, August 14, I arrive home from work at about 7:15p.m. As I am preparing to eat, a man appears immediately from behind, with an order of trespass, asks my name and says he is "just doing his job." Ms. Manigo-Murray appears right after and says "They don't want you here." She proceeds to tell me to pack my things, while looking at her watch. She threatens to call the police. I am extremely fatigued from anemia and having had a health scare with the 113 degree heat-wave of the previous week, I do not want to relive the ordeal of Friday eve. Nor do I subject my self to further abuse and disrespect at the hands of SMOC's representatives. I ask that she call a cab for me, though I have not received my first pay and have no cash. The Program Coordinator makes no offer to help with transportation, even though it is late and after dark when the taxi arrives, and there is not even public transit available.

23) At the time of my arrival at Wright House, unfamiliar with the lexicon of the "recovery movement," I did not understand the term "sober house" to mean a resident population predominantly made up of substance abusers. I interpreted it to mean "No drinking allowed on the premises." Rather, I was led to believe through a flier and in an interview, that Wright House was

"a transitional program for homeless women." and that "the program was designed to assist *displaced* women in securing permanent housing." While it made mention of women with substance abuse problems, the words "sober house" were neither used nor emphasized in the literature, nor were they used in the newspaper articles I later read about the Home. No indication was given in the interview that I, as someone who does not do drugs or abuse alcohol would be required to subordinate my own judgment about my health and well-being to the judgment of those still "in recovery," or that management would pander to the alcoholic population (seemingly because of their greater number) at the expense of the health and safety and of the residents who were not, to remain in the Wright House.

24) With regard to SMOC's offer of an apartment, as mentioned in the letter from their Insurance agent, Interstate Insurance Group, of May 10, 2002: after I had been threatened, coerced, had the police called on me, served by a sheriff and ejected from the residence into the night, Ms. Leoni again met with me to discuss SMOC's offer, (which *offer* never came up on the day of all the threats and intimidation), through a subsidy that is mandated for alcoholics in recovery. I feared first, I would find myself in a situation where I would be presumed to be--or treated like--an alcoholic or substance abuser by SMOC'S agents and handlers who might somehow, once again, find a way to "snatch the rug out from under me," and I would be suddenly without housing again. The offer was contingent upon my allowing Ms. Leoni, (who mentioned in our conversation, that she was a former corrections officer), to "check up on me." Since I am neither an alcoholic nor a criminal, and have never been, coupled with the experiences I had just undergone at the hands of the alcoholics and substance abusers in "recovery" at the Wright House, including the Director, I declined.

25) The actions of "trespassing" and threatening me with arrest if I did not leave constitute "threats, intimidation or coercion" under Massachusetts' Civil Rights Act, G.L. c. 12, &III, see generally Bally v. Northeastern University, 403 Mass. 713, 718-720 (1989). Violation of Article 11 of the Massachusetts Declaration of Rights in that I was not provided sufficient hearing to address the allegations, M.G.L. c. 12 section 11H and 11I. And DEPRIVATION OF CIVIL RIGHTS BY A PERSON ACTING UNDER COLOR OF STATE LAW IN VIOLATION OF TITLE 42, U.S.C. 198 Further, having suffered damages including, but not limited to severe emotional distress, embarrassment, harassment, loss of an opportunity at a *critical juncture* to address a debilitating health condition, I suffered and continue to suffer a subsequent decline in health, (because a postponement of treatment), and displacement.

WHEREFORE, I, Karen Unaka, as plaintiff in this matter, pray that the Court find that the defendants have violated my rights under the United States Constitution and the Massachusetts Declaration of Rights, award damages, plus costs and attorney fees, and the Court grant injunctive relief and any further or additional relief as it deems fair and just.

Signed Karen Unaka

Karen Unaka
P.O. Box 754
Hadley, MA 01035-0754

Dated: January 7, 2005

8

COMMONWEALTH OF MASSACHUSETTS
SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

04 193

HAMPSHIRE, SS

NORTHAMPTON DIVISION
CIVIL ACTION NO. 04-193

KAREN UNAKA,

Plaintiff,

V.

SOUTH MIDDLESEX OPPORTUNITY COUNCIL,

Defendant.

HAMPSHIRE SUPERIOR CRT
HARRY JEKANOWSKI JR
CLERK
2005 FEB 28 A 9:12

**ANSWER OF DEFENDANTS, SOUTH MIDDLESEX OPPORTUNITY COUNCIL, INC., BRUCE S. HULME AND AMY TOLLER, TO AMENDED COMPLAINT**

The defendants, South Middlesex Opportunity Council, Inc. ("SMOC"), Bruce S. Hulme and Amy Toller, hereby answer the plaintiff's Amended Complaint, paragraph by paragraph, as follows:

[sic] Defendants admit that plaintiff is a former program participant of the Wright Home for Women in Easthampton, Hampshire County, Massachusetts. Defendants deny the remaining allegations contained in paragraph 1.

1. Admitted.

2. Admitted.

3. Defendants admit that Rena Manigo-Murray was formerly a Program Coordinator for the Wright Home for Women. Defendants deny the remaining allegations contained in paragraph 3.

4. Defendants admit that Amy Toller is the Director for Statewide Homeless Services, including the Wright Home for Women. Defendants deny the remaining allegations contained in paragraph 4.

Overview

Defendants state that plaintiff's "overview" is a narrative summary to which no response is required. To the extent that a response is required, plaintiff's "overview" is denied.

**STATEMENT OF FACTS**

1. Defendants admit that on August 9, 2001, the Program Coordinator for the Wright Home for Women, Rena Manigo-Murray, informed plaintiff that she was terminated from the program and would be required to vacate the premises by 5:00 p.m. on August 10, 2001. Answering further, defendants state that plaintiff was terminated from the program because she had physically assaulted two other program participants and had repeatedly violated house rules. Defendants are without information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in paragraph 1.

2. Defendants admit that plaintiff requested that she not be required to attend recovery meetings. Answering further, defendants state that plaintiff was told that all house meetings and workshops were mandatory and plaintiff accepted this by signing an agreement to abide by house rules. Defendants deny the remaining allegations contained in paragraph 2.

3. Defendants admit that plaintiff violated house rules on numerous occasions by missing mandatory house meetings. Defendants are without information sufficient to form a belief as to the truth or falsity of the plaintiff's allegations regarding her attempts to retrieve her belongings. Defendants deny the remaining allegations contained in paragraph 3.

4. Defendants admit that plaintiff called the Program Coordinator on one occasion about missing a mandatory house meeting. Answering further, defendants state that plaintiff missed other mandatory house meetings without any advance phone call to the Program Coordinator. Defendants are without information sufficient to form a belief as to the truth or falsity of the plaintiff's allegations regarding her reasons for missing a house meeting. Defendants deny the remaining allegations contained in paragraph 4.

5. Defendants admit that the position of House Manager is held by a program participant and that it is a volunteer position. Answering further, defendants state that the House Manager is selected by both the Program Coordinator and Director of Statewide Homeless Services. Defendants deny the remaining allegations contained in paragraph 5.

6. Defendants are unable to admit or deny the allegations contained in paragraph 6 due to program participant confidentiality including, without limitation, the confidentiality of treatment records mandated by G.L. c. 111B, § 10, 42 U.S.C. § 290dd-2 and 42 C.F.R. § § 2.1 et seq.

7. Denied.

8. Defendants are unable to admit or deny the allegations contained in paragraph 8 due to program participant confidentiality including, without limitation, the confidentiality of treatment records mandated by G.L. c. 111B, § 10, 42 U.S.C. § 290dd-2 and 42 C.F.R. § § 2.1 et seq.

9. Defendants are unable to admit or deny the allegations contained in paragraph 9 due to program participant confidentiality including, without limitation, the confidentiality of treatment records mandated by G.L. c. 111B, § 10, 42 U.S.C. § 290dd-2 and 42 C.F.R. § § 2.1 et seq. Answering further, defendants state that plaintiff never reported to defendants that she was

accosted by another program participant or that she was otherwise being stalked or harassed by another program participant.

10. Defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 10.

11. Defendants admit that on August 9, 2001, the Director of Statewide Homeless Services, Amy Toller, met with the plaintiff and listened to her account of the incident and further admit that plaintiff was informed that she would be required to vacate the premises by 5:00 p.m. on August 10, 2001. Defendants deny the remaining allegations contained in paragraph 11.

12. Defendants admit that Amy Toller spoke with plaintiff on the telephone. Answering further, defendants state that Amy Toller explained to plaintiff that the reason she had to leave the program was because of the physical violence toward other program participants. Defendants deny the remaining allegations contained in paragraph 12.

13. Defendants are without information sufficient to form a belief as to the truth or falsity of the plaintiff's allegations regarding the substance of her conversations with her attorney and the police. Defendants deny the remaining allegations contained in paragraph 13.

14. Defendants admit that Rena Manigo-Murray and SMOC's Housing Specialist, Mary Leone, assisted plaintiff with alternative housing, which specifically included both short term and long term placements. Answering further, defendants state that plaintiff failed to sign up for a meeting with Mary Leone during her stay at the Wright Home for Women despite having had an opportunity to do so. Defendants are without information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in paragraph 14.

15. Defendants are without information sufficient to form a belief as to the truth or falsity of the plaintiff's allegations regarding statements made by Mary Leone. Defendants admit that John Curtin, the Program Coordinator for another SMOC program, arrived to assist plaintiff with alternative housing and to provide plaintiff with transportation to a housing placement that defendants had secured for plaintiff. Defendants further admit that John Curtin spoke with police on this occasion. Defendants are without information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in paragraph 15.

16. Defendants admit that the police arrived at the Wright Home for Women on or about August 10, 2001. Answering further, defendants state that the police were called because plaintiff refused to leave the property. Defendants further state that the program participants who had been assaulted by plaintiff expressed being in fear of their lives and refused to press charges against plaintiff. Defendants are without information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in paragraph 16.

17. Defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 17.

18. Defendants deny the allegations contained in paragraph 18. Answering further, defendants state that plaintiff did receive the benefit of a grievance procedure and defendant did secure for plaintiff an appropriate housing placement.

19. Defendants admit that plaintiff refused to leave the Wright Home for Women despite the fact that she had been terminated from the program. Defendants are without information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in paragraph 19.

20. Defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 20.

21. Defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 21.

22. Defendants admit that SMOC caused plaintiff to be served with a notice of trespass at approximately 7:30 p.m. on August 14, 2001 and that plaintiff was advised to pack her personal belongings. Answering further, defendants state that the Program Coordinator called the plaintiff a taxi cab and that plaintiff departed the premises at approximately 8:30 p.m. Defendants are without information sufficient to form a belief as to the truth or falsity of the plaintiff's allegations regarding her medical condition. Defendants deny the remaining allegations contained in paragraph 22.

23. Defendants are without information sufficient to form a belief as to the truth or falsity of the plaintiff's allegations regarding what plaintiff believed. Defendants deny the remaining allegations contained in paragraph 23. Answering further, defendants state that plaintiff was advised of the mandatory attendance at all house meetings and workshops, including recovery meetings, and that plaintiff understood and accepted this as evidenced by her signed agreement of the house rules.

24. Defendants admit that Mary Leone secured permanent housing for plaintiff, but denies that such housing was contingent on allowing Ms. Leone to check up on plaintiff. Defendants deny that plaintiff was threatened, coerced or otherwise intimidated. Defendants are without information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in paragraph 24.

25. Denied.

WHEREFORE, the defendants deny that plaintiff is entitled to any form of relief and demand that plaintiff's Amended Complaint be dismissed with an award of attorneys' fees and costs in its favor.

FIRST AFFIRMATIVE DEFENSE

Plaintiff has failed to state a cause of action upon which relief can be granted.

SECOND AFFIRMATIVE DEFENSE

This action is barred by the applicable statute of limitations.

THIRD AFFIRMATIVE DEFENSE

Plaintiff comes before this Court with unclean hands.

FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by principles of laches.

FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by principles of estoppel.

SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred for insufficient service of process.

SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred for insufficiency of process.

EIGHTH AFFIRMATIVE DEFENSE

This is action is barred due to misnomer of a party.

SOUTH MIDDLESEX OPPORTUNITY COUNCIL, INC., BRUCE S. HULME and AMY TOLLER

By their attorney,

Marisa L. Pizzi (BBO#637383)
John H. Perten (BBO#548728)
Bowditch & Dewey, LLP
161 Worcester Road
P. O. Box 9320
Framingham, MA 01701
(508) 879-5700

Date: February 24th, 2005

I hereby certify that a true copy of the above document was served upon the attorney of record for each party by mail/hand on 2/24/05

3

COMMONWEALTH OF MASSACHUSETTS

04 193

HAMPSHIRE, ss.

SUPERIOR COURT
NORTHAMPTON DIVISION
DOCKET NO.

KAREN UNAKA

vs.

SOUTH MIDDLESEX OPPORTUNITY COUNCIL
Bruce S. Hulme, President & Relevant Parties
Defendants

MOTION TO EXTEND TIME FRAME

1 The Plaintiff, KAREN UNAKA is an individual, and former resident of Wright House Easthampton, MA, Hampshire County

2 The Defendant, SOUTH MIDDLESEX OPPORTUNITY COUNCIL, Administrative Offices located at 300 Howard Street Framingham, MA, owner and operator of Wright Home for Women, Easthampton MA, Hampshire County

3 Defendant, RENA MANIGO-MURRAY, Program Coordinator, Wright House for Women

4 Defendant, AMY TOLLER, Director, Wright House for Women

5 Defendant, VICTORIA PETERSON, House Monitor/Resident, Wright House for Women

6 Defendant, RENEE ALBERT, Resident, Wright House for Women

I, Karen Unaka, plaintiff in the above action hereby move this Court to extend time frame for the following reasons:

1. Following the initial filing, further action on the case was postponed by the need to set aside time for care and attention to my health, which involved undergoing a needed operation.

2. Recent discovery that, although complaint was sent out via certified mail by me and a signed receipt by an official of the sheriff's office was returned to me, upon calling the Middlesex County Sheriff's Office no record of service having been made to above named defendant Bruce Hulme was found, nor can document be accounted for.

3. Several of the defendants' whereabouts are unknown to me at this time.

3. Having just spoken with counsel, I wish to allow time for case to be submitted for his review and consultation.

For the foregoing reasons, and taking into consideration the upcoming season of major holidays and all that that entails, I request that this Motion [to extend time frame] to January 10, 2005 be granted.

Respectfully submitted,

Karen Unaka

Karen Unaka
P.O. Box 754
Hadley, MA 01035
(413) 586-2865

Dated: November 12, 2004

HAMPSHIRE SS
SUPERIOR COURT
FILED
NOV 15 2004
CLERK/MAGISTR

11/19/04 Excusable neglect and good cause having been shown, motion is allowed. Time for service extended to 1/10/05. (M. L. Ruf)

5

04 193

COMMONWEALTH OF MASSACHUSETTS

HAMPSHIRE , ss.

SUPERIOR COURT
NORTHAMPTON DIVISION
DOCKET NO. 04 193

KAREN UNAKA

vs.

SOUTH MIDDLESEX OPPORTUNITY COUNCIL

MOTION TO EXTEND TIME FRAME

The Plaintiff, KAREN UNAKA is an individual & former resident of Wright Home for Women, 305 main Street, Easthampton, MA, Hampshire County

Defendant, SOUTH MIDDLESEX OPPORTUNITY COUNCIL, Administrative Offices located at 300 Howard Street, Framingham, MA, Middlesex County - owner and operator of Wright Home for Women, 305 Main Street, Easthampton MA, Hampshire County

Defendant, BRUCE S. HULME, President, South Middlesex Opportunity Council

Defendant, RENA MANIGO-MURRAY, Program Coordinator, Wright Home for Women, 305 Main Street, Easthampton, MA, Hampshire County

Defendant, AMY TOLLER, Director, Wright Home for Women, Easthampton MA, Hampshire County

2005 JAN -7 P 4: 05
HAMPSHIRE SUPERIOR CRT
HARRY JEKANOWSKI JR
CLERK

I, Karen Unaka, plaintiff in the above action hereby move this Court to extend time frame for the following reasons:

1. Representation at this time remains pro se, and as proceedings of this Court are unfamiliar to me, I wish time to further pursue legal representation for my case.

2. Upon contacting the Middlesex Deputy Sheriff's office on January 5, I discovered that, although attempted by their office, service upon defendant Bruce S. Hulme, President of South Middlesex Opportunity Council, I had not been accomplished.

3. Changes to the parties named as defendants in the Complaint

For the foregoing reasons, I request that this Motion to Extend Time Frame to February 15, 2005 be granted.

Respectfully submitted,

Karen Unaka

Karen Unaka
P.O. Box 754
Hadley, MA 01035
(413) 586-2865

1/11/05 Motion is allowed and time for service is hereby extended to 2/8/05. No further extensions.
(M.L. Rup)